Filed 8/19/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| RUSSELL L. JOHNSON,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STONERIDGE CREEK<br>PLEASANTON CCRC LLC et al.,<br><br>    Defendants and Appellants. | A170383<br><br><br>(Alameda County Super.<br>Ct. No. 21CV004133) |

Russell Johnson filed a class action complaint against Stoneridge Creek Pleasanton CCRC LLC, Spieker Senior Development Partners LLC, and Continuing Life LLC (collectively, Stoneridge Creek). Johnson is a resident of Stoneridge Creek's continuing care retirement community in Pleasanton and seeks to represent a class of current and former residents. He alleges that Stoneridge Creek violated numerous statutes, including Health and Safety Code section 1770 et seq., the Unfair Competition Law (Bus. & Prof. Code § 17200 et seq.) (UCL), the Consumer Legal Remedies Act (Civ. Code § 1750 et seq.) (CLRA), and Welfare and Institutions Code section 15600 et seq. (the Elder Abuse Act), and also breached the Residence and Care Agreement (RCA) between residents and Stoneridge Creek.

After the trial court denied its motion to compel arbitration of Johnson's claims, Stoneridge Creek finalized its annual budget for 2023, allocating $500,000 for legal fees, including its anticipated defense costs in this litigation. The 2024 budget similarly allocated $500,000 in legal fees,

whereas prior budgets had set substantially lower amounts. These budgets served as the basis for annual increases to the monthly fees that residents pay.

Johnson moved for a preliminary injunction, seeking to enjoin the increases to the extent they included Stoneridge Creek's defense costs in this litigation. He argued that the increases violated litigation fee-recovery provisions of the CLRA and Elder Abuse Act, which provide for an award of fees only to prevailing plaintiffs, and constituted unlawful retaliation under the UCL. Stoneridge Creek disputed those contentions and further argued that the inclusion of its anticipated defense costs was authorized by Health and Safety Code section 1788, subdivision (a)(22)(B) (section 1788(a)(22)(B)), which provides that "changes in monthly care fees shall be based on projected costs, prior year per capita costs, and economic indicators."[1] It noted that, in response to a complaint from Johnson, the California Department of Social Services (Department), which is responsible for regulating CCRCs and enforcing the statutory scheme, found that Stoneridge Creek's anticipated legal expenses qualified as "projected costs" under section 1788(a)(22)(B) and that it had not engaged in retaliation. Stoneridge Creek contended that the trial court should defer to these findings.

The trial court granted Johnson's motion on the grounds he raised. Stoneridge Creek appeals, arguing that Johnson failed to establish a likelihood of success on any claim that would render the proposed increases unlawful, and that the balance of harms tips in its favor because it cannot recover its legal costs from residents in the future, whereas if Johnson prevails, he will be entitled to damages and attorneys' fees. Stoneridge Creek

---

[1] Undesignated statutory references are to the Health and Safety Code.

2

also challenges as inadequate the $1,000 bond the trial court ordered Johnson to deposit with the court.

We will reverse. We conclude that the increases do not constitute a recovery of attorneys' fees in violation of the litigation fee-shifting statutes on which Johnson relies. We also agree with Stoneridge Creek that, as the Department concluded, section 1788(a)(22)(B) permits it to use monthly fee revenue to fund its defense costs, and accordingly permits an increase to those monthly fees based on reasonable projections of future litigation expenses. That said, the statute is not a license for retaliation, including in the form of inflated projections of legal expenses, and the trial court was not required to defer to the Department's finding that Stoneridge Creek did not retaliate. However, because the trial court evaluated Johnson's retaliation claim in the context of its conclusion that the increases were unlawful in their entirety under the CLRA's fee-recovery provision, and never decided whether the inclusion of legal expenses in monthly fees would otherwise be authorized by section 1788(a)(22)(B), we believe that remand is appropriate so the trial court can revisit its retaliation finding as well as its assessment of the balance of interim harms. Should it determine that issuance of a preliminary injunction remains warranted, it can reevaluate the appropriate bond amount at that time.

## BACKGROUND

### I.

Stoneridge CCRC opened in 2013, with "565 residential living units and more than 750 residents." The minimum age of residents is 60 years old, and the entrance fees in 2023 ranged from around $400,000 to more than $3 million.

3

Johnson, like other residents, agreed to the RCA when he joined the community in 2017. He paid close to $1.5 million as an entrance fee and his monthly care fees started at $6,705 for himself and his partner. Paragraph 8.4.3 of the RCA he signed states: "Stoneridge Creek reserves the right, in its sole discretion, to increase your Monthly Fee upon thirty (30) days' advance written notice to you. A determination by Stoneridge Creek to adjust or not to adjust your Monthly Fee shall be conclusive and binding on you. . . . Such adjustments shall be based on Stoneridge Creek's projected costs, prior year per capita costs and economic indicators, as determined by Stoneridge Creek in its sole discretion . . . ." The RCA grants Stoneridge Creek the authority to terminate the RCA if a resident fails to pay the monthly fees. A resident who terminates the agreement early forfeits to Stoneridge Creek a portion of the entrance fee, up to a maximum of 25 percent of the fee after four years.

In December 2021, Johnson filed his initial complaint. Stoneridge Creek moved to compel arbitration of Johnson's claims, but the trial court denied the motion and we affirmed, agreeing that the RCA's arbitration provision was unconscionable. Afterward, Johnson filed his second amended complaint, alleging that Stoneridge Creek unlawfully increased vulnerable elderly residents' monthly care fees, charged retaliatory legal fees to residents, and engaged in other practices that violated the UCL, CLRA, Elder Abuse Act, and Health and Safety Code. Johnson alleged that the RCA contains unlawful provisions and that Stoneridge Creek's financial practices violate the RCA, the covenant of good faith and fair dealing, and its fiduciary duty to residents. Johnson requested damages, penalties, and attorneys' fees.

Since 2017, Stoneridge Creek has budgeted the following amounts for legal fees: $125,000 (2017, 2018, 2019); $25,000 (2020); $75,000 (2021);

4

$50,000 (2022); and $500,000 (2023, 2024).  The record does not reveal whether or to what extent those legal fees were related to litigation matters and, if so, the nature of those matters.  Stoneridge Creek began preparing the 2023 budget—which included the $500,000 expense for legal fees—around the time the trial court denied its motion to compel arbitration.  Resident representatives were told that the $500,000 expense included Stoneridge Creek's attorneys' fees in this case.

In August 2023, Zeke Griffin, Stoneridge CCRC's executive director, made the mid-year budget presentation for 2024.  During the presentation, he "discussed and compared the actual revenues and expenses for the first six months of [2023] with the budget."  Griffin informed residents that Stoneridge CCRC "had spent only $50,000 for legal fees in the first six months of the year, just 10 percent of the $500,000" charged to residents.  According to Johnson, in later budget discussions, Stoneridge Creek representatives stated that Stoneridge Creek's fees for 2024 were increasing by 5.9%, whereas fees at the owner's other CCRCs were rising by between 4.7% and 4.9%, with the additional percentage point at Stoneridge Creek attributable to the costs of Johnson's lawsuit.  As the case progressed, Johnson stated, resident resistance to the litigation "became more vocal," including with comments that residents would ultimately end up paying all of Stoneridge Creek's legal fees, and some residents told Johnson they could not afford to pay the extra costs.  Resident demands that Johnson settle this case also increased.

According to Griffin, the budgeted $500,000 covered all legal expenses, not just those for this litigation, and the increases projected for 2023 and 2024 "were reasonable estimates based on what Stoneridge Creek expected to incur for all of its legal matters in 2023 and 2024."  Stoneridge Creek, he

5

explained, neither retroactively charges residents for negative budget variances, nor provides refunds for positive ones. Instead, "Stoneridge Creek uses past expenses and variance[s] in budgeted revenue and expenses as a way to inform future budgets." Stoneridge Creek's actual legal fees for 2023 totaled $96,812. Because there are roughly 565 units at Stoneridge Creek as well as approximately 70 residents at its Creekview higher care facility, Griffin calculated that, on average, the legal fees for 2023 and 2024 would be $787 annually, or $66 monthly, for each living unit/Creekview resident.

## II.

Johnson sent a letter to the Department on November 21, 2022, asking it to investigate the lawfulness of the monthly care fee increases and discussing the Department's 2021 decision in a case involving another CCRC, the Vi at Palo Alto (*Vi*). In the *Vi* decision, the Department reviewed similar claims about whether the CCRC was entitled to include in residents' monthly fees legal expenses incurred in a wage and hour lawsuit. In that case, the Department concluded that, although government-imposed fines and penalties were not "legitimate costs of operation" passed on to residents as monthly fees, other legal expenses arising from the settlement of the wage and hour claims—including the legal fees incurred to defend the case—could be charged to residents pursuant to section 1788(a)(22)(B), at least absent evidence that, as provided in the contract between the CCRC and the management company, the management company engaged in systematic, willful, or intentional misconduct.

After the Department failed to respond to Johnson's letter, another resident, Patricia Kohnen, wrote to the Department on January 30, 2023, asking it to expedite its response to Johnson's letter. After she, too, did not receive a timely reply, she sent a follow up email on June 29, 2023,

6

referencing her and Johnson's earlier letters and expressing residents' anxiety at having to pay the legal costs for 2023 and anticipating increased legal costs for 2024. Around the same time, at least one resident stated his understanding that Stoneridge Creek was increasing monthly care fees to punish residents for this lawsuit. Johnson sent a second letter to the Department on June 29. On June 30, the Department sent Kohnen a Complaint Intake Notification, acknowledging receipt of her email. A Department investigator spoke with Kohnen for about 10 minutes on July 28.

Griffin sent the Department's investigator an email on August 10, in response to investigation questions that came up in a call and email. Griffin's letter includes a statement that "residents have since communicated that they hope this litigation will end soon in order to curtail their monthly fee increases needed to cover these legal defense expenses."

The Department issued a one-page Complaint Investigation Report on August 29, 2023, identifying it as a response to Kohnen's complaint. The report describes the single operative allegation as that Stoneridge Creek "incorrectly included litigation expenses in the monthly care fee increase calculation" as " 'projected costs, prior year per capita costs and economic indicators,' under . . . section 1788(a)(22)(B)." It states that the investigator met with Griffin and viewed Stoneridge Creek's "2023 Budget Presentation" and "Summary of projected legal expenses for 2022 and the 2023 budgeted legal expense." The investigator found that, "[a]s to the 2022 projected legal expense and 2023 budgeted legal expense, the Department believes that legal expense to defend the community from suits can be an appropriate cost in the operation of a community. So, it does not find a violation as to the 2022 projected legal expense or 2023 budgeted legal expense. . . . [¶] Based

7

on the review and investigation the Department finds the allegation 'unsubstantiated.' "

On November 22, 2023, the Department sent a follow up letter to Johnson's counsel, stating that his claims had been investigated, but that the Department had failed to notify him of the investigation results. It stated that the Department determined that litigation costs could be included as a "projected cost" within the meaning of the statute and compared it to the *Vi* case, noting its determination that the inclusion of fees in that case was not evidence of retaliation because it was "consistent with the continuing care contract statutes." It ended by saying that it investigated Johnson's allegations of "harassment and retaliation," but "[b]ased on the evidence gathered during the investigation, the Department found no evidence that Stoneridge Creek suggested that the resident association sanction [Johnson] for his complaints."

## III.

In March 2024, Johnson moved to enjoin Stoneridge Creek from compelling Johnson and members of the putative class to fund its "attorneys' fees and costs incurred in or related to the instant litigation." He argued that he was "likely to prevail on his claim for injunctive and/or declaratory relief that Defendants may not compel residents to fund their defense costs."[2] He argued, first, that by requiring residents to bear its litigation expenses in the form of increased monthly fees, Stoneridge Creek was violating laws that he

---

[2] The complaint includes a request for preliminary and permanent injunctive relief in the prayer for relief, but it does not specify the nature of the injunctive relief Johnson is seeking. The complaint includes a cause of action for declaratory relief, but states only that it is seeking declaratory relief "regarding the rights and responsibilities of the respective parties under the RCA and [the Health and Safety] Code."

8

contends would entitle only *him*, as a prevailing plaintiff, to recover legal fees in the action insofar as it asserts claims under the Elder Abuse Law, the CLRA, or the UCL (through Code of Civil Procedure section 1021.5).[3] Second, he argued that Stoneridge Creek's conduct would deter him and other members of the putative class from pursuing their claims, in violation of Health and Safety Code section 1771.7(a), which provides that "[a] resident of a continuing care retirement community shall not be deprived of any civil or legal right, benefit, or privilege guaranteed by law, by the California Constitution, or by the United States Constitution, solely by reason of status as a resident of a community," and section 1771.7(g), which provides that "resident[s] ha[ve] the right to freely exercise all rights pursuant to this section, in addition to political rights, without retaliation by the provider." And third, he argued that the RCA would be unconscionable if construed to authorize Stoneridge Creek to pass its litigation expenses onto members of the putative class.

In response, Stoneridge Creek argued that its conduct was not a violation of litigation fee-shifting provisions because those statutes concern a *court's* power to order one party to pay another's legal fees, not how a CCRC may budget for legal fees when setting or adjusting residents' monthly fees. It also pointed to section 1788(a)(22)(B), arguing that its litigation expenses

---

[3] Both Johnson and the trial court referred to the CLRA's fee-recovery statute as "one-way" provision, but it might better be characterized as "non-reciprocal":  A prevailing plaintiff is entitled to an award of fees, whereas a prevailing defendant may recover fees only at the discretion of the court and only if the defendant establishes bad faith by the plaintiff.  (Civ. Code, § 1780, subd. (e).)  Although the parties have not addressed the issue, we assume that absent class members could not be held liable for an award of fees under this provision even if Johnson could.  (Cf. *Earley v. Superior Court* (2000) 79 Cal.App.4th 1420, 1431; *Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 869.)

qualified as "projected costs," as the Department found. It criticized Johnson's reliance on section 1771.7 because that statute does not create a private right of action and because it was "unclear" how Johnson's allegation of retaliation, which was made in his motion but not in the second amended complaint, "connects to any of the claims." Finally, Stoneridge Creek contended that Johnson's motion failed to supply any competent evidence that the inclusion of legal fees was motivated by a desire to harass him, and it asserted that Johnson's contention that it would include any judgment entered against it in this case in future budgets was "speculative."

The court found, first, that there was a "substantial basis" to conclude that Stoneridge Creek's conduct was retaliatory. Although the action had been filed in late 2021, Stoneridge Creek did not propose to increase residents' monthly fees to account for this litigation until July 2022 (when it circulated proposed budget documents for 2023), which the trial court found notable because it had held the RCA's arbitration provision invalid earlier that month, in part because the provision "unconscionably denied [Johnson's] statutory fee rights." In addition, the size of the increase was unusually large and the projected amount "far exceed[ed] the legal fees included in any prior budget since 2017." The court noted: "The 2023 and 2024 legal fees are each ten . . . times the fees in 2022, and four . . . times the next largest budgeted amount (i.e., $125,000). However, there is no evidence that the fees actually incurred by [Stoneridge Creek] ever approached $500,000 in one year. Based on this record, the most [Stoneridge Creek] incurred in legal fees was in 2022, when they incurred roughly $232,000 in fees. . . . In 2023, . . . [Stoneridge Creek's] legal fees dropped to $96,812 and resulted in roughly $403,188 of unspent funds budgeted for legal fees. . . . The leftover from 2023 is more than triple the next largest amount budgeted for legal fees (i.e., $125,000)

10

and exceeds the highest fees incurred by [Stoneridge Creek] in a single year. As [Stoneridge Creek] acknowledge[s], residents are not 'refunded' fees when the budgeted expenses exceed the actual expenses. . . . Therefore, even considering this litigation, [Stoneridge Creek's] projected budgets of $500,000 far exceed[] the fees that could be reasonably incurred and support[] a finding of retaliatory intent."

The court then turned to Johnson's argument that allowing Stoneridge Creek to include its defense costs in monthly fees charged to residents would violate the fee-recovery provision of the CLRA or other litigation fee-shifting laws. It concluded that it would undermine the express statutory purpose and policy of the CLRA's fee-recovery provision (Civ. Code, § 1780, subd. (e)) to allow Stoneridge Creek to fund its legal expenses with residents' monthly fees.[4] In response to Stoneridge Creek's argument that its conduct is authorized by section 1788(a)(22)(B), the court stated that the statute "cannot be read in isolation" and does not define "projected costs." The Department's interpretation, the court found, was not entitled to great deference because courts "regularly construe statutes" and interpreting section 1788(a)(22)(B) in this context "does not require technical knowledge or expertise." It faulted the Department for failing to consider the CLRA, or in the *Vi* case, PAGA, which has a similar fee-shifting provision.

Finally, the court found that Stoneridge Creek's conduct was likely to violate section 1771.7, subdivision (g), which guarantees residents the exercise of their civil and legal rights "without retaliation" by the CCRC, and that the UCL gave the putative class the ability to sue for a violation of that

---

[4] The court also cited the fee-recovery provision for elder abuse claims (Welf. & Inst. Code, § 15657.5, subd. (a)), but expressly found only that Johnson established a likelihood of success on his fee-shifting theory under the CLRA.

11

provision. It rejected the Department's finding that Stoneridge Creek had not retaliated against Johnson, stating that the Department "has no greater ability to recognize retaliation than a court" does.

Based on the foregoing analysis, the court found that Johnson "has established a likelihood of prevailing on the merits of the CLRA and UCL claims."

As to the comparative interim harm, the court stated that "there is evidence that at least one resident has left Stoneridge Creek as a result of the increase," referencing the declaration of Harry Wong, who wrote that the increase in Stoneridge Creek's monthly fees, "including the increases to pay ownership's legal costs for this litigation, was a major motivator for my decision to leave. . . ."[5] The court noted that the lawsuit appeared to be responsible for an increase per resident of over $500 annually, and that "[c]onsidering this is a retirement community and that at least one resident declares that the increase has forced them to move, the evidence demonstrates a risk of irreparable injury absent injunctive relief." The court added that residents who cannot pay the fees face the prospect of potential eviction, and noted that the fact that the putative class had not been certified was not a bar to provisional relief because Code of Civil Procedure section 527 expressly authorizes a trial court to enter a preliminary injunction before certification. Stoneridge Creek argued that it would suffer financial hardship, including impacts to its operating income and corresponding

---

[5] Wong was added as a plaintiff in a later-filed third amended complaint. Like the parties, we refer in our discussion to the second amended complaint because it was the operative pleading when the motion for preliminary injunction was filed and adjudicated. Counsel also indicated at oral argument that the trial court has since certified the class, but there has been no suggestion, and we do not find, that certification impacts our analysis of the issues on appeal.

decreases to other services, with "no clear path to recovering these fees in the future." The court noted, however, that Stoneridge Creek had not argued that it "would be forced out of business or unable to defend [itself] in this litigation if th[e] injunction were granted."

On balance, the court concluded, Johnson had "establish[ed] a reasonable probability of prevailing on the merits and irreparable harm from [the] denial of injunctive relief." The court ordered Johnson to post a nominal $1,000 bond, explaining that "there is no evidence of lost income" and Stoneridge Creek had already obtained a "significant windfall" because its 2023 budget for legal fees substantially exceeded the amount expended.

Stoneridge Creek filed a writ of supersedeas and request for immediate stay of the order granting the preliminary injunction in this court, arguing the injunction was mandatory and therefore automatically stayed. We denied the writ, ruling that the injunction was prohibitory, not mandatory, and further that Stoneridge Creek had not shown that a discretionary stay was warranted.[6]

## DISCUSSION

## I.

We begin with some background before taking up the parties' arguments. "Continuing-care communities are a new business for old Americans. They promise to provide housing and health-care assistance . . . for as long as their residents live. The residents pay very large sums both

---

[6] We reject Stoneridge Creek's renewed arguments that the injunction was mandatory, rather than prohibitory, because Stoneridge Creek historically included legal fees in its annual budgets. The injunction prohibited from charging residents for *this* litigation, and in any event, Stoneridge Creek did not show that it previously included its anticipated fees to defend lawsuits filed against it by residents.

13

upfront and over time to the communities to provide for services of uncertain duration and cost. The communities must make sure they earn returns on their investments despite these uncertainties. And state governments recognize that elderly people who have given up very large amounts of money in exchange for a promise need to have someone make sure the promise is kept." (*Continuing Life Communities Thousand Oaks LLC v. Commissioner* (2022) 123 T.C.M. (CCH) 1148, *1 (*Continuing Life Communities*).)

CCRCs are funded by two primary means: entrance fees and monthly care fees. (See § 1771, subds. (e)(3), (m)(1).) There are no statutory limits on the amount of entrance or initial monthly care fees, but the CCRC statute, section 1700 et seq., limits CCRCs' ability to increase monthly care fees. (§ 1788(a)(22)(B).) Over time, an increasing percentage of residents' entrance fees becomes nonrefundable; in this case, the RCA makes up to 25 percent of residents' entrance fees nonrefundable after four years. (See § 1788, subd. (a)(33).) One of the principal benefits to CCRC residents is the right to receive memory care, assisted living, and skilled nursing as they age without an increase in their monthly care fees based on those increased services. (§§ 1771, subds. (l), (p)(5); 1787, subd. (i); 1788, subd. (b)(1).) But that right also creates a financial risk to CCRCs; they must make projections about the percentage of residents who will need those more expensive services and for how long. (*Continuing Life Communities*, *supra*, 123 T.C.M. (CCH), at p. *1.) "Because elderly residents often both expend a significant portion of their savings in order to purchase care in a continuing care retirement community and expect to receive care at their continuing care retirement community for the rest of their lives, tragic consequences can result if a continuing care provider becomes insolvent or unable to provide responsible care." (§ 1770, subd. (b).)

14

## II.

A trial court may enter a preliminary injunction pursuant to Code of Civil Procedure section 526, subdivision (a). "In deciding whether to issue a preliminary injunction, a court must weigh two 'interrelated' factors: (1) the likelihood that the moving party will ultimately prevail on the merits and (2) the relative interim harm to the parties from issuance or nonissuance of the injunction. . . . [¶] The trial court's determination must be guided by a 'mix' of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one, the less must be shown on the other to support an injunction." (*Butt v. State of California* (1992) 4 Cal.4th 668, 677–678.)

"Our review of a preliminary injunction 'may trigger any or all of the three standards of appellate review.' [Citation.] The trial court's evaluation and weighing of the parties' likelihood of success on the merits and the balance of harm is reviewed for abuse of discretion. [Citation.] We review de novo the trial court's application of legal principles and we review its findings of fact under the substantial evidence standard." (*Anderson v. County of Santa Barbara* (2023) 94 Cal.App.5th 554, 568.) The same standards guide our review of the trial court's order requiring Johnson to post a bond. (See *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 737–739.)

## III.

We start with whether the trial court abused its discretion in concluding that Johnson established a likelihood of success based on his fee-shifting theory under the CLRA. For present purposes, the relevant CLRA claim is not that Stoneridge Creek engaged in actionable misrepresentations under the CLRA and that Johnson will be entitled to an award of fees at the conclusion of the litigation if he prevails. As Stoneridge Creek acknowledges,

15

regardless of whether it funds its defense costs through residents' monthly fees, the court will be able to order it to pay *Johnson's* attorneys' fees if he prevails on that claim in the litigation. So that issue is not before us—nor is any question about what sources of funds Stoneridge Creek could permissibly use to satisfy such an award if ultimately entered by the court. Here, the relevant claim is that Stoneridge Creek violated the CLRA's fee-recovery provision by causing its litigation opponents—Johnson and members of the putative class—to fund its defense costs without any showing that it would be entitled to an award of its fees from them at the end of the case. As it did in the trial court, Stoneridge Creek responds that raising its defense costs through residents' monthly fees does not constitute fee shifting in violation of the CLRA's fee-recovery provision, and that it is authorized to include those fees by section 1788(a)(22)(B), as the Department concluded. In this section, we explain why we agree that the CLRA's fee-recovery provision does not prohibit Stoneridge Creek from funding its defense costs through the monthly fees it charges to residents.

The provision reads as follows: "The court shall award court costs and attorney's fees to a prevailing plaintiff in litigation filed pursuant to this section. Reasonable attorney's fees may be awarded to a prevailing defendant upon a finding by the court that the plaintiff's prosecution of the action was not in good faith." (Civ. Code, § 1780, subd. (e).) The reason the statute provides for an award of fees to a prevailing plaintiff is to "allow[] consumers to pursue remedies in cases . . . where the compensatory damages are relatively modest." (*Hayward v. Ventura Volvo* (2003) 108 Cal.App.4th 509, 512.) Without the potential for an award of fees, it would be uneconomical for a plaintiff to file suit when the expense of prosecuting the litigation exceeds the potential recovery, significantly reducing the

16

effectiveness of the CLRA. Because that rationale does not apply to defendants, the Legislature did not extend the same rule to them, instead permitting the court to award fees to a prevailing defendant only on a showing of the plaintiff's bad faith. (See *Corbett v. Hayward Dodge, Inc.* (2004) 119 Cal.App.4th 915, 924.) Again, here the court will be able to order Stoneridge Creek to pay Johnson's attorneys' fees if he prevails, removing as a financial obstacle to filing that Johnson's potential recovery could be dwarfed by what he would owe his lawyers for prosecuting the case. (Johnson has not shown that his potential recovery in the case is unlikely to exceed the amount of his monthly fees attributable to Stoneridge Creek's legal expenses—$787 annually.)

As quoted above in full, Civil Code section 1780, subdivision (e) addresses only fee awards made by the court based on judicial findings at the conclusion of litigation—an order that requires one party to pay the legal fees incurred by the other. It says nothing about how a defendant may raise funds to pay its legal fees. Recall that a CCRC has two primary sources of revenue—money it receives or earns from entrance fees that residents pay when they join the community, and money it receives from residents' monthly fees. It would stretch Civil Code section 1780 subdivision (e) far beyond its plain language to construe it as prohibiting Stoneridge Creek from relying on one (or both) of those two sources of funds to pay its own defense costs. Johnson points out that the trial court also cited Civil Code section 1760, which states that the CLRA "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." But while the prospect of an increase in monthly fees could operate as a disincentive for a CCRC

17

resident to sue, the interpretive guidance in Civil Code section 1760 cannot make the CLRA's fee-recovery provision mean more than it says. (*Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30, 40 ["A liberal construction does not permit us to disregard or enlarge the plain provisions of the statute, nor does it go beyond the meaning of the words used when they are clear and unambiguous"].)

Johnson repeatedly writes that Stoneridge Creek is shifting its fees to the "putative class," but that description is, at a minimum, imprecise. To begin with, the proposed class includes former residents, who therefore may not have been subject to the monthly fee increases targeted by the preliminary injunction motion. More importantly, the members of the putative class who *are* subject to the increased fees are not subject to them *because* they are putative class members, but only because they are current residents of Stoneridge Creek. As Johnson himself writes, "Appellants were only able to charge Mr. Johnson and other putative class members for attorneys' fees not recoverable by law because of their status as residents i.e., by including Appellants' attorneys' fees in 'monthly fees' that residents are forced to pay in full, on pain of eviction."

Johnson's observation highlights the flaw in his argument that Stoneridge Creek violates the CLRA's fee-recovery provision by funding its defense costs through residents' monthly fees. Suppose Johnson had brought the case only on his own behalf. In that situation, other residents would still pay increased monthly fees even though they have no connection to the litigation. As to those residents, there would be no sense in which Stoneridge Creek could be said to be causing its litigation opponents to bear its defense costs, and thus no colorable basis to claim a violation of the CLRA's fee-recovery provision. The situation would be no different from any other

18

business—a hotel, say, or a fitness club—raising its prices to cover defense costs after being sued under the CLRA.  And as to Johnson himself, because Stoneridge Creek's defense costs would be spread across hundreds of residents, he would bear only a tiny fraction of those costs, even though he was the sole plaintiff—with the fractional share depending on the number of residents at the Stoneridge community and having nothing to do with the merits of his claims.  That situation is not analogous to a court ordering Johnson to pay Stoneridge Creek's legal fees at the conclusion of the case.

The mere fact that Johnson has styled his suit as a class action does not change the analysis.  Even putting aside the fact that Johnson sought the injunction before moving for class certification, the point remains that residents (including Johnson himself) are not bearing Stoneridge Creek's defense costs because they are actual or potential opponents in the litigation.  They are bearing those costs because, for as long as they stay, they are the source of Stoneridge Creek's revenue.  Johnson identifies nothing in the CLRA's fee-recovery provision, nor anything in the case law interpreting it, that prohibits a business from raising its prices to fund its defense costs simply because its customers happen to be plaintiffs or members of a class.  Again, the statute merely limits the circumstances in which a court may order a plaintiff to pay the defendant's legal fees.  When the court does so, the plaintiff is liable for those fees *because* it is the plaintiff, and at that point is legally obligated to pay them.  That is not what is happening here.

To point out the difference is not to diminish Johnson's arguments that CCRC residents may be in a uniquely difficult situation.  A person who wishes to avoid the increased monthly fee by leaving the community might not have the financial ability to do so (in part because a significant percentage of the entrance fee has become nonrefundable), and a person who

19

is unable to afford the increased monthly fee could potentially face eviction. But the seriousness of those possible hardships does not mean that Stoneridge Creek violated *the CLRA's fee-recovery provision*. As the parties recognize, there are laws, like section 1788(a)(22)(B), that govern the fees that CCRCs may charge residents, and indeed, the parties take contrary positions on whether Stoneridge Creek's fee increases comply with them. Those rules may take into account the hardships Johnson identifies along with countervailing risks that Stoneridge Creek invokes: Any rule that permits CCRCs to increase monthly fees could threaten some residents' financial ability to remain in the community, but a rule that imposed excessive limits on fee increases could compromise a CCRC's financial viability, placing *all* of its residents at risk. (See § 1770, subd. (b).) Presumably these and other competing considerations are what the CCRC statutory scheme is intended to balance.

But Johnson's preliminary injunction motion sought relief on the ground that the increases violated the CLRA's fee-recovery provision and other litigation fee-shifting statutes, not that they violated section 1788(a)(22)(B). We conclude that subdivision (e) of Civil Code section 1780 does not prohibit the challenged monthly fee increases and that the trial court erred insofar as it held otherwise. And although the trial court ultimately relied solely on the CLRA's fee-recovery provision, the same reasoning leads us to the same conclusion with respect to the other fee-recovery provisions Johnson raised: Elder Abuse Act section 15657.5, subdivision (a); Code of Civil Procedure section 1021.5; and the American rule. Accordingly, any claim based on this theory—whether the CLRA, the UCL, or (as Johnson wrote in his motion in the trial court) for injunctive or

20

declaratory relief—does not support the trial court's issuance of the preliminary injunction.[7]

## IV.

Because Johnson did not raise section 1788(a)(22)(B) as a ground for relief and the trial court accepted his theory based on the CLRA's fee-recovery provision, it did not decide whether section 1788(a)(22)(B) would otherwise permit Stoneridge Creek to include within monthly fees the legal expenses that it will incur to defend against this lawsuit.[8]  Having disagreed with Johnson's fee-shifting theory, we could similarly decline to reach the question except for the fact that, as we discuss in the next section, a conclusion that litigation fees may be included in "projected costs" under section 1788(a)(22)(B) could affect the trial court's remaining retaliation finding, its analysis of the comparative interim harm, and the balance between the two.  Because we will remand for the trial court to revisit those questions, we could in principle also leave the interpretation of section 1788(a)(22)(B) to the trial court in the first instance.  But when the

---

[7] Johnson argues that Stoneridge Creek violates the substantive provisions of the CLRA by representing in the RCA that it " 'complies with the minimum statutory requirements applicable to continuing care contracts' " while "tak[ing] the position that the RCA was designed to authorize their conduct, even though it is in direct conflict with" litigation fee-shifting rules.  He also argues that the RCA would be unconscionable in violation of the CLRA if construed to permit Stoneridge Creek to include its defense costs in monthly fees because it would nullify residents' "statutory right to recover their attorneys' fees and to litigate free of the risk of paying Appellants' fees."  We reject these arguments based on our discussion above.

[8] At the hearing, the court stated, "I didn't reach that issue [of operating costs] because it wasn't raised."  Referring to section 1788(a)(22)(B), it stated, "In isolation, perhaps these [fees] can be imposed," but added that "allowing [Stoneridge Creek] to get fees now does seem like an end run around" the CLRA's fee-recovery provision.

issue is one of law that we would review de novo in any event, there is little to be gained by doing so and it could risk further delay. (See *Barrera v. Apple American Group LLC* (2023) 95 Cal.App.5th 63, 77.) The parties fully briefed the issue both in the trial court and on appeal, and no one has asked us to refrain from deciding it. We therefore take it up here.

## A.

The first question is whether we should afford the Department's interpretation of section 1788(a)(22)(B) any deference. Although the trial court ultimately did not interpret section 1788(a)(22)(B), it nonetheless stated that it did not believe the Department's interpretation warranted deference in part because there was no indication that the Department considered the CLRA's fee-shifting provision. Although we have found no violation of that provision, we note that statutes generally should be interpreted together only when they concern the same subject matter. (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 175; cf. *Shiheiber v. JPMorgan Chase Bank, N.A.* (2022) 81 Cal.App.5th 688, 702 [statutes addressed different subjects and had different purposes]; *Water Quality Assn. v. County of Santa Barbara* (1996) 44 Cal.App.4th 732, 747 [declining to construe statutes together that do not relate to the same subject and have different purposes].) There is nothing to indicate that, when enacting the CLRA's fee-recovery provision, the Legislature had in mind the regulation of CCRC finances and charges to residents—that statutory scheme was enacted years later—or the purposes it is designed to further. If "projected costs" in section 1788(a)(22)(B) includes fees a CCRC will incur to defend a suit brought by a resident, it may reflect the Legislature's assessment that those fees are an appropriate expenditure to protect the community and that a contrary rule could in some cases threaten a CCRC's solvency. To find that

22

an unrelated litigation fee-shifting statute prohibits CCRCs from using monthly fee revenue to pay defense costs notwithstanding any policy judgments embodied in section 1788(a)(22)(B) could risk undermining the CCRC statutory scheme. Accordingly, we do not believe the Department's failure to address the CLRA's or (in the *Vi* case) PAGA's fee-shifting statutes calls into question its interpretation of section 1788(a)(22)(B).

Johnson contends that the Department's report in response to his and Kohnen's complaints not only overlooked the fee-shifting statutes he raised but also was "based on an argument no resident had made"—i.e., that Stoneridge Creek's inclusion of its legal expenses in residents' monthly fees was contrary to section 1788(a)(22)(B). We disagree. Although it is true that Johnson did not rely on section 1788(a)(22)(B) in his preliminary injunction motion—even his complaint did not clearly allege such a theory of liability— his letter to the Department argued that Stoneridge Creek's inclusion of its legal expenses was contrary to the Department's decision in the *Vi* case, which, as the letter itself pointed out, rested on section 1788(a)(22)(B). In light of this argument, it was reasonable for the Department to conclude that Johnson was challenging the lawfulness of Stoneridge Creek's conduct under that section.

Stoneridge Creek asks us to treat the Department's interpretation of the statute as a quasi-legislative rule or regulation to which we are required to defer. We decline to do so. Although the Department has authority to promulgate regulations (§ 1776), it offered its interpretation of section 1788(a)(22)(B) in its response to Johnson's and Kohnen's complaints. Its investigative report is not equivalent to a regulation adopted pursuant to a delegation of legislative authority. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 (*Yamaha*).) Unlike a regulation,

23

"the binding power of an agency's *interpretation* of a statute or regulation is contextual:  Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merits of the interpretation." (*Id.* at p. 7.)  As described in *Yamaha*, those factors can be divided into two categories.  First, an agency will be presumed to have " 'a comparative interpretive advantage over the courts' " when it has relevant " 'expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Id.* at p. 12.)  Second, an agency interpretation is "likely to be correct" when there are "indications of careful consideration by senior agency officials," "evidence that the agency 'has consistently maintained the interpretation in question, especially if [it] is long-standing,' " and "indications that the agency's interpretation was contemporaneous with legislative enactment of the statute being interpreted." (*Id.* at p. 13.)

Starting with the second set of factors, it is not apparent from the record that the Department's interpretation was rendered at high levels of the agency.  Moreover, while its determination that Stoneridge Creek's defense costs in this litigation are "projected costs" under section 1788(a)(22)(B) is consistent with its decision in the 2021 *Vi* case, the *Vi* lawsuit was brought by the CCRC's employees rather than by a resident, so the application of the rule in this context may have been a question of first impression—and one that was answered long after the statute was enacted. We also note that the Department's report is only a single page, and no reasoning is offered to explain its conclusion.  (See *Yamaha, supra*, 19 Cal.4th at p. 14 [court may consider the " 'thoroughness' " of the agency's

24

consideration and " 'the validity of its reasoning' "].)  We find little basis for deference in these factors taken together.

With respect to the first set of factors, by contrast, the financing arrangements for CCRCs and the risks associated with them are relatively specialized and complex, so in our view the Department does have relevant technical knowledge and expertise.  Moreover, when the agency is "interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues." (*Yamaha, supra*, 19 Cal.4th at p. 11.)  Section 1788(a)(22)(B) is but one sliver of an elaborate and interconnected statutory scheme.  The Department is responsible for monitoring and regulating CCRCs, controls entry into the industry, investigates complaints from residents, and has the authority to suspend or revoke permits or certificates of authority if it finds a violation of the applicable statutes or rules.  (§§ 1770, subd. (d); 1771.5; 1771.7, subds. (h)–(j); 1776.2; 1793.21, subd. (a).)  Given these considerations, we would not lightly disregard the Department's perspective, particularly when, as discussed below, we find the statutory language ambiguous.  Ultimately, however, we must "independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning." (*Yamaha*, at p. 7.)  We therefore turn to that issue.

**B.**

Our fundamental task in construing any legislative enactment " 'is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.]  We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context.  If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the

statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837–838.)

Again, section 1788(a)(22)(B) provides that "changes in monthly care fees shall be based on projected costs, prior year per capita costs, and economic indicators." Stoneridge Creek argues that we need not go beyond the plain language. While acknowledging that the statute does not define "projected costs," Stoneridge Creek notes that "Black's Law Dictionary defines 'cost' as the 'amount paid or charged for something; price of expenditure,' and it defines 'expenditure' as (1) the 'act or process of spending or using money, time, energy, etc.' and (2) a 'sum paid out.' Legal fees are, of course, the cost paid for legal services."

We do not think the issue can be so simply resolved. As the Supreme Court has explained, " '[t]he interpretation of a statute . . . should not end . . . with a dictionary definition of a single word used therein.' [Citation.] Instead, to interpret a statute, we consider *all* of its language 'in context' and with reference to 'provisions relating to the same subject' and 'the whole system of law of which [the statute] is a part.' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 20.) Accepting Stoneridge Creek's argument would mean that *anything* a CCRC pays for, for whatever purpose and without regard to residents' benefit, could be included in monthly fees charged to residents. We agree with Johnson that, in the context of the overall statutory scheme, section 1788(a)(22)(B) is intended in

26

part to impose limits, as the Department treated it when it concluded in the *Vi* case that the CCRC could not charge the community for penalties or government attorneys' fees for which it was found liable.

As the parties note, while "projected costs" is undefined, the term "per capita costs" is defined as "a continuing care retirement community's operating expenses, excluding depreciation, divided by the average number of residents." (§ 1771, subd. (p)(1).) It is reasonable to construe "costs" the same way each time it appears in section 1788(a)(22)(B), and thus the term "projected costs" can be understood to refer to the CCRC's projected operating expenses excluding depreciation. (*People v. Johnson* (2020) 45 Cal.App.5th 379, 396 [" ' "It is presumed, in the absence of anything in the statute to the contrary, that a repeated phrase or word in a statute is used in the same sense throughout" ' "].) Unfortunately for present purposes, "[t]he term 'operating expenses' is not one of clear and universal definition. It is a term which is used in a variety of contexts, including public utility rate regulation, tax codes, governmental loan programs, commercial leases and other business contracts, as well as for internal accounting and managerial purposes. . . . Whether a particular item may be included or excluded from 'operating expenses' necessarily depends upon the purpose and context in which the phrase is used." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1222.)[9]

---

[9] In its reply brief, Stoneridge Creek adds that the term "net operating expenses" is elsewhere defined to include "all expenses" except certain "interest and credit enhancement expenses," "[d]epreciation or amortization expenses," a "reimbursement paid to the provider during the past 12 months for services to residents other than residents holding continuing care contracts," and "[e]xtraordinary expenses that the department determines may be excluded by the provider." (§ 1792.4, subd. (a)(2)(A)–(D).) But that

27

Stoneridge Creek directs us to *Arizona Oddfellow-Rebekah v. U.S. Dept. of H.U.D.* (9th Cir. 1997) 125 F.3d 771, 773, in which a HUD (Housing and Urban Development) regulatory agreement limited Arizona Oddfellow, a low-income housing project for the elderly, to using project revenues to pay for " 'reasonable operating expenses and necessary repairs.' "  The court held that attorneys' fees Arizona Oddfellow incurred to defend against pattern-and-practice racial discrimination suits qualified as "operating expenses" that could be paid with project revenues because they primarily benefitted the project rather than the owner.  "Such expenses . . . do not serve to advance or protect [the owner's] ownership interests.  They do, however, benefit the project in so far as they protect project resources and help preserve the project's discretion in hiring and rentals.  Like expenses incurred in actions to collect rent or evict tenants, expenses incurred in defense of discrimination suits arising from day-to-day business are the unavoidable costs of running a project, and are therefore 'operating expenses.' "  (*Id.* at p. 775.)  The court acknowledged that an adverse judgment might be a "serious indictment" of management, including the owner, but emphasized that it would not "implicate the owner's ownership interests any more than other [non-pattern-and-practice] discrimination suits" because nothing in the record suggested that, if it lost a case, Arizona Oddfellow "would have forfeited its ownership interest, or suffered a default or foreclosure." (*Ibid.*)[10]  Stoneridge Creek argues that here, too, the lawsuit does not implicate ownership interests, and

_____

section, which requires CCRCs to maintain a reserve, expressly states that its definitions are "[f]or purposes of this section."  (*Id.*, subd. (a).)

[10] In reaching a contrary conclusion, the district court reasoned that pattern-or-practice suits should be treated differently because they "are directed at management in a way that other discrimination actions are not." (*Arizona Oddfellow, supra*, 125 F.3d at p. 775.)

that its defense "helps preserve Stoneridge resources, such as those to provide care to its residents and to enhance the community's marketability," and further "safeguards the Stoneridge community's public image and reputation, its contractual and statutory rights, and its managerial discretion."

Johnson does not take issue with the distinction *Arizona Oddfellow* drew between ownership and project interests in analyzing whether defense fees were "operating expenses," but argues that a defense judgment in this case would preserve ownership profits with no benefit to residents. According to Johnson, because the care and services Stoneridge Creek must provide are fixed by the RCA and by statute—and are separately funded by other line items in the monthly fees—prohibiting Stoneridge Creek from including its defense costs could have no negative impact on the care or services residents receive. But *Arizona Oddfellow* treated "ownership interests" much more narrowly than Johnson does, focusing on whether the dispute implicated the owner's ability to maintain its *ownership* of the project or property. For Johnson, by contrast, anything that increases the CCRC's profitability serves ownership rather than community interests, but he does not explain how the distinction between funds available for the operation of the community and funds that contribute to the owner's profits is to be drawn ex ante. Moreover, because budgets are imperfect, the fact that there are different line items for different categories of expenditures does not mean that Stoneridge Creek's inability to rely on monthly fees for its legal expenses can have no impact on the availability of funds for included expenses—even if one assumes, as Johnson does, that residents cannot derive any benefit from Stoneridge Creek's defense of this litigation.

But we do not believe that assumption is warranted. Johnson contends that Stoneridge Creek's expenditure of fees to defend the lawsuit cannot serve the interests of the community because it only protects Stoneridge Creek "from liability for numerous legal violations that have harmed residents. . . ." At this point, however, whether Stoneridge Creek has committed legal violations remains to be determined. Because the parties agree that the propriety of including litigation fees as an item of "costs" must be determined prior to the adjudication of any claims, an approach that starts by assuming the resident's claims are meritorious is unworkable. From a vantage point before the claims have been adjudicated, it would be incorrect to say that the defense of the lawsuit has no potential benefit to the community.

For example, the ongoing viability of the community depends on the willingness of new people to join as space becomes available. Marketing is a line item in the budget covered by monthly fees, and Johnson's complaint does not allege that it is improper. If marketing is a legitimate operating expense, then so too may be the defense of a lawsuit that charges Stoneridge Creek with, among other things, creating "a financial and legal nightmare" for its residents, "misappropriating the entrance fees" they pay, engaging in "scofflaw and retaliatory behavior," and "routinely violat[ing] the statutory protections afforded to residents." If these claims are true, then the community stands to benefit if Johnson proves them, but if they are not true, then the community has an interest in Stoneridge Creek establishing that they are not. Similarly, we cannot say that the preservation of management discretion when faced with efforts to hamper it—efforts that may prove legally unfounded—offers no possible benefit to the community.

Taking another tack, Johnson argues that, because monthly care fees are defined as "the fee charged to a resident in a continuing care contract on a monthly or other periodic basis for current accommodations and services, including care, board, or lodging" (§ 1771(m)(1)), we should interpret "costs" or "operating expenses" to encompass only legal fees incurred to provide services or accommodations to residents.  But Johnson's lawsuit relates to those matters, challenging, for example, Stoneridge Creek's alleged failure to provide services promised in the RCA and the way it has financed its provision of affordable housing, as well as its budget planning process, the validity of monthly fee increases, and the RCA's compliance with applicable laws.  In our view, a CCRC's legal costs to provide accommodations and services may reasonably include defending against allegations that the way it has done so fails to comply with applicable laws—allegations that may prove to be incorrect.

Lastly, Johnson notes that section 1771.7, subdivision (a) provides that "[a] resident of a continuing care retirement community shall not be deprived of any civil or legal right, benefit, or privilege guaranteed by law, by the California Constitution, or by the United States Constitution, solely by reason of status as a resident of a community."  While Johnson's reference to this provision is tied almost entirely to his discussion of retaliation, which we discuss separately below, there is a passing suggestion in his brief that residents would lose a meaningful ability to sue the CCRC if the CCRC's defense costs would be drawn from, and could potentially increase, their own monthly fees.  We are not persuaded.

In a run-of-the-mill lawsuit—suppose a resident trips over an obstruction in a sidewalk and sues the CCRC for negligence in maintaining it—there will be only one or a small number of plaintiffs, with the defense

31

costs spread across the entire community. Because the CCRC may anticipate some litigation expenses and will budget accordingly, there may not be any increase tied to a specific lawsuit. Even if the knowledge that defense costs would be drawn from all residents' monthly fees might cause the resident to think twice before suing, we cannot say that the resident has been "deprived" of access to the courts as a result.

Johnson does not argue that the interpretation he offers should apply only to class actions, but again, even in this case we do not see Stoneridge Creek's ability to pay its defense costs from monthly fee revenue as depriving Johnson or members of the putative class of their right to sue. While Johnson filed a declaration stating that there was a drop in support for the lawsuit among residents once it became clear that Stoneridge Creek would raise monthly fees to pay its defense costs, both his declaration and other evidence indicates that some residents opposed the suit even before Stoneridge Creek proposed any increase and that their concerns about the increases were not necessarily independent of their questions about the merits of Johnson's claims. Moreover, as we discuss in the next section, we agree with Johnson that Stoneridge Creek cannot retaliate by increasing fees based on an unreasonable projection of its costs. Yet even taking the proposed $500,000 annual budget for legal fees at face value, it adds $66 to monthly fees that range from just under $4,000 to over $7,500, depending on the residential unit. Neither in this case nor as a general matter do we think Johnson has established that section 1788(a)(22)(B) would deny residents their civil or legal rights within the meaning of section 1771.7, subdivision (a) if "projected costs" were construed to include defense costs, especially when, as discussed above, the expenditure could potentially benefit the community.

32

In sum, although the statutory language does not unambiguously compel the answer, we think the better view is that litigation fees incurred to defend the CCRC in a suit by a resident are operating expenses that constitute "costs" as that term is used in section 1788(a)(22)(B). They are likely an unavoidable cost of doing business, and contrary to Johnson's arguments, the expenditures are not necessarily contrary to the community's interests. While Johnson argues that Stoneridge Creek has "ample resources with which to defend the case," the meaning of the statute cannot depend on the current financial condition of Stoneridge Creek, and it is beyond dispute that one of the principal concerns of the statutory scheme is to ensure the solvency of CCRCs. (§ 1770, subd. (b).) Moreover, because the Department is responsible for overseeing CCRCs and is familiar with their financial structure, operations, and risks, we give some weight to its interpretation. "Of course, if the Legislature disagrees with our construction of the statute, it remains free to amend the statute to better reflect its intent." (*Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1199.)

Lastly, we note that our analysis is subject to an important qualification that Stoneridge Creek acknowledged at oral argument. Consistent with the Department's decision in the *Vi* case, Stoneridge Creek agreed that if it is ultimately found to have engaged in *intentional* misconduct, then its litigation costs to defend against those allegations, if paid from residents' monthly fee revenue, constitute damages to the class. Thus, to the extent the trial court on remand does not enjoin Stoneridge Creek from using monthly fee revenue to pay its defense costs while the litigation is ongoing, it may still determine, when the claims are adjudicated, that some or all of those costs are not an appropriate charge against the community and should be awarded as damages to the class.

## V.

Having concluded that section 1788(a)(22)(B) authorizes Stoneridge Creek to include its defense costs when setting or raising residents' monthly fees, we now explain our decision to remand to the trial court to reconsider its remaining findings in light of that conclusion.

## A.

We start with the trial court's finding that Johnson established a likelihood of success on his claim that the monthly fee increases were unlawful under the UCL because they were retaliatory. Section 1771.7, subdivision (g) provides that "[t]he resident has the right to freely exercise all rights pursuant to this section," which includes the rights in subdivision (a), "without retaliation by the provider." Although Stoneridge Creek argues that section 1771.7 does not provide for a private right of action, the trial court correctly concluded that this provision is actionable under the UCL, which "borrows" legal violations from other statutory schemes where those violations were undertaken pursuant to business activity. (*Turner v. Seterus, Inc.* (2018) 27 Cal.App.5th 516, 545; see *Long Beach Memorial Medical Center v. Kaiser Foundation Health Plan, Inc.* (2021) 71 Cal.App.5th 323, 342 ["[A] plaintiff states a claim under the unlawful prong of the unfair competition law by showing that [a] challenged [business] practice violates a California 'statute or regulation' "].)

The trial court cited the timing and size of the monthly fee increases as the bases for its finding that Stoneridge Creek retaliated against Johnson for prosecuting this lawsuit. To the extent Stoneridge Creek contends that section 1788(a)(22)(B) immunizes it from liability for retaliation, we reject the argument. The fact that Stoneridge Creek may include its litigation fees as an item of "projected costs" under section 1788(a)(22)(B) obviously does not

34

mean that it may use unreasonable or inflated projections to retaliate against Johnson. We also reject Stoneridge Creek's argument that the trial court erred insofar as it declined to defer to the Department's conclusion that there was no retaliation. While we have given some weight to the Department's interpretation of section 1788(a)(22)(B), its retaliation finding does not warrant the same consideration. The Department never interviewed Johnson, even though its own procedures required it to do so. In its belated response to Johnson's counsel, the Department stated that it found no evidence that Stoneridge Creek "suggested that the resident association sanction your client for his complaints." That is not what Johnson claimed happened, and the Department's finding did not address Johnson's contention that circumstances surrounding the imposition of the fees showed retaliation. (*Yamaha, supra*, 19 Cal.4th at p. 14.) Moreover, because Johnson's letter did not clearly allege that the proposed amounts were inflated estimates of Stoneridge Creek's likely expenditures—and again, the Department never followed up with him—the Department had no occasion to examine that issue.

We cannot ignore, however, that the trial court made its retaliation finding in the context of its decision that the fee increases were unlawful in their entirety because they circumvented the fee-recovery provision of the CLRA. As to timing, the court wrote: "[A]lthough this action was filed in late 2021, Defendants started including fees related to this litigation in the projected budget only after this court denied Defendants' motion to compel arbitration, in part because it unconscionably denied plaintiff statutory fee rights." Stoneridge Creek argues that it always prepares its budgets for the upcoming year starting in July, as it did here, and it followed the typical process to prepare and present the budget to residents, and then to finalize it.

35

The new fees did not go into effect until 2023, again consistent with Stoneridge Creek's usual practice. At a minimum, we think the significance of the timing identified by the trial court may appear different if section 1788(a)(22)(B) authorized Stoneridge Creek to include its defense costs in the budget and it simply adhered to the same planning schedule it used year after year.

As to the amounts, the trial court entered an injunction that prohibited Stoneridge Creek from charging residents for *any* defense costs related to this litigation, not simply amounts that it believed were excessive. We assume that egregious conduct could warrant such a sanction, but given the trial court's ruling based on the CLRA, it was unnecessary for it to consider by how much Stoneridge Creek's projections were inflated and whether the increases should be reduced rather than prohibited altogether. We express no opinion, but remand to the trial court to consider those questions.

**B.**

Turning to the balance of harms, the trial court determined that they tipped in Johnson's favor because increases in monthly care fees could cause residents to leave or be evicted, whereas Stoneridge Creek had not stated that it could not afford to defend itself in the litigation or that it would be forced out of business if it was not allowed to charge its legal costs to residents.

We observe that Johnson's evidentiary showing on the harms identified by the trial court was relatively modest. It appears from the Wong declaration that the increase in monthly fees was not the only reason for his decision to leave; moreover, only a portion of the increase was attributable to the inclusion of litigation expenses. As noted above, the evidence indicated that the increase at Stoneridge Creek as a result of this litigation was

36

roughly a percentage point higher than at the owner's other CCRCs. Johnson did not offer any evidence that he or other residents would leave as a result of the increases attributable to the lawsuit.[11] Moreover, if the trial court on remand were to enjoin only the amounts it concludes were excessive, it would have to assess to what extent that difference would be likely to cause either voluntary or involuntary departures, measured against any likely irreparable harm to Stoneridge Creek.[12]

---

[11] In his brief, Johnson does not assert that other residents are likely to leave or be evicted, instead contending that "the primary evidence of irreparable harm was the real and significant social costs" to *him*, which included "los[ing] both friendships and the peaceful enjoyment of his residence and community." The trial court apparently did not accept this evidence as establishing cognizable harm, and we see no error in that implicit determination. Johnson has not shown that the increase in fees exceeds putative class members' potential recovery in this case; as Stoneridge Creek points out, that recovery would include as damages any monthly fees that were wrongfully charged. Where the potential economic harm residents would experience from the increased fees is not irreparable—and in the absence of evidence showing significant interim financial hardship to residents—any resulting antagonism toward Johnson may reflect his failure to persuade them of the ultimate value of the litigation. That would not constitute interim harm to be addressed by the entry of a preliminary injunction. In any event, because the injunction prevents Stoneridge Creek from charging fees to all residents, the interim harm to be avoided must be harm to the putative class members, not to Johnson alone.

[12] In its briefing, Stoneridge Creek implied (without explanation) that if it were preliminarily enjoined from paying its defense costs with monthly fee revenue, and later established that it *was* legally entitled to use those revenues for that purpose, it could not then raise monthly fees to recoup the amounts it had previously paid from other sources. Asked about that issue at oral argument, Stoneridge Creek's counsel answered that section 1788(a)(22)(B) is forward-looking and does not appear to authorize such a recovery. Johnson's counsel was largely noncommittal in response, at least beyond suggesting that Stoneridge Creek currently appeared to be accounting for its defense costs in a way that was intended to facilitate a

Lastly, because the decision whether to enter a preliminary injunction requires balancing the potential-merit and interim-harm factors—"the greater the plaintiff's showing on one, the less must be shown on the other" (*Butt v. State of California, supra*, 4 Cal.4th at p. 678)—the trial court should reassess the overall balance after revisiting each factor.

## VI.

Code of Civil Procedure section 529, subdivision (a) requires a court to order a party who obtains an injunction to provide an undertaking. "The 'purpose of requiring security is to afford compensation to the party wrongly enjoined or restrained . . . .' " (*Top Cat Productions, Inc. v. Michael's Los Feliz* (2002) 102 Cal.App.4th 474, 478.) Stoneridge Creek contends that the $1,000 undertaking ordered by the court here was inadequate and an abuse of discretion.

Because we have concluded that the preliminary injunction rests at least in part on an invalid ground, the trial court must reevaluate on remand the proper amount of the undertaking Johnson must post if it determines that entry of a preliminary injunction remains appropriate. The adequacy of the undertaking will depend on the nature of any injunction entered.

## DISPOSITION

The trial court's order granting Johnson's motion for preliminary injunction is reversed. On remand, the court shall evaluate whether a preliminary injunction should be entered on grounds not inconsistent with this opinion, and if so, the proper amount of the undertaking. Stoneridge Creek is entitled to recover its costs on appeal.

GOLDMAN, J.

---

later effort to recover them. Because the parties have not briefed the issue, we do not resolve it here, but note that it may be relevant to the remaining questions for the trial court on remand.

38

WE CONCUR:

BROWN, P. J.
CLAY, J. *

---

*Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Alameda County Superior Court |
| Trial Judge: | Honorable Brad Seligman |
| Counsel for Plaintiff and Respondent: | GLYNN, FINLEY, MORTL, HANLON & FRIEDENBERG, Adam D. Friedenberg |
| Counsel for Defendants and Appellants: | HANSON BRIDGETT, Gary A. Watt, Shannon M. Nessier, Matthew J. Peck, Patrick T. Burns, Matthew B. Seipel |